BELL *v.* STATE.

Opinion delivered October 7, 1929.

*W. J. Lanier* and *Roy D. Campbell,* for appellant.

*Marvin B. Norfleet,* Special Counsel for State, for appellee.

BUTLER, J. Robert Bell and Grady Swain, two negro boys, were indicted for the murder of Julius Mc-Cullom by drowning. The crime is alleged to have been committed in St. Francis County, and, on a trial in the circuit court of that county, they were convicted of murder in the first degree, sentenced to death, and, on appeal to this court, the case was reversed and remanded. 177 Ark. 1034. Afer the reversal, the case was transferred to the circuit court of Woodruff County, on change of venue, where the cases were severed, and Robert Bell was placed upon trial. That trial resulted in a verdict of guilty of murder in the first degree, with a sentence to the penitentiary for life, from which an appeal has been duly prosecuted to this court.

In the opinion rendered in the case of *Bell and Swain* v. *State, supra,* the facts were stated, and therefore there will be no restatement of the facts here, except such as are necessary for the consideration of the case now before us.

On the first appeal there were two assignments of error pressed upon the court for a reversal of the judgment. It was insisted, first, that the confessions introduced in evidence were obtained by coercion, and were not freely and voluntarily given; and, in the second assignment of error, it was insisted that the evidence was not legally sufficient to warrant the verdict. The court reversed the case on the second ground of error, holding that there was no independent evidence, aside from the confessions, that any one drowned Julius McCullom and Elbert Thomas, and that the evidence was not legally sufficient to warrant a verdict of guilty. The court said:

"For the reason that we have reached the conclusion that the evidence is not legally sufficient to support the verdict, it will not be necessary to decide whether or not the confessions were extorted from the defendants by whipping them. In this connection, however, we again call attention to the fact that this court is committed to the rule that confessions used in evidence against the defendant must be free and voluntary, and they must not be extorted from them by whipping them or by any inquisitorial method."

On the second trial of this case there was additional testimony introduced on the part of the State tending to establish the *corpus delicti.* One German Jones, a negro man, who was not a witness in the case of *Bell and Swain* v. *State,* was introduced, and testified to the fact that, on the day when Julius McCullom and Elbert Thomas were drowned, he was hunting in the afternoon of that day along the shores of the bayou in which the bodies of the two boys were later found, and, hearing a splash in the water, thought it might be ducks, and slipped through the bushes to where he had a view of the bayou, and saw two colored people standing in a boat, facing each other, and in the act of throwing, and did throw, a white "human" in the water; and, seeing this, witness turned and ran away.

Another witness, who was not a witness at the first trial, one A. H. Davidson, gave testimony in the case. He testified that, some time in the afternoon of the day the boys were drowned, he had taken Mrs. McCullom to her home in his car. This appears to have been around three o'clock in the afternoon, and, in something like a half or three-quarters of an hour, he returned to the store, where he saw Bell and Swain going toward the bayou. This testimony, together with the other testimony in the case, is perhaps sufficient to warrant the submission to the jury, so that it is necessary to pass upon the admissibility of the confession made to Campbell and McCollum and detailed by them to the jury, over

the objections and exceptions of defendant, and which was assigned as error in the motion for a new trial.

On the 29th of December, 1927, at some time in the afternoon—probably between three o'clock and sundown —Julius McCullom, a white boy about twelve years old, and a negro' youth about nineteen or twenty years of age, were drowned at a point directly in front of the store of the white boy's father, in a small bayou, which at that time contained a great deal of water. Little Julius was discovered missing about dusk, and a search made for him. He had been seen going toward the bayou with Elbert Thomas, and the waters of the bayou were searched, where, about eight or nine o'clock that night, the body of Julius was found. It developed later that the body of Elbert Thomas was lying in deeper water, and several feet away from the body of Julius. It was first thought that Elbert Thomas had drowned Julius, and an active search was made for him throughout the country, Grady Swain, one of the defendants, having stated, after having been whipped at the jail, and asked if Elbert Thomas had not drowned Julius, that Elbert Thomas had in fact drowned Julius, and that he (Swain) had assisted him. About ten days later, after the water had gone down somewhat, the body of Elbert Thomas was found. In the meantime both Robert Bell and Grady Swain had been arrested and put in jail, and, when the body of Elbert Thomas was found, they were conveyed to the State Penitentiary at Little Rock for safekeeping. Shortly after having been placed in the penitentiary, Bell made a confession, in which he professed to have been in company with Swain, and that the two of them had drowned Thomas and Julius McCullom, stating that he had drowned the negro, Thomas, and that Swain drowned the white boy. Swain, on the other hand, stated that he had drowned the negro, and that Bell had drowned the white boy. Bell gave the details as to how the acts were committed, and this confession was at a later date written down and signed by Bell, while he was

still in the penitentiary. On a trial of the case this written confession was offered in evidence, but excluded by the court. W. J. Campbell, the sheriff of St. Francis County, and B. McCullom, the father of Julius, however, were permitted to testify before the jury as to an oral confession made to them by Bell substantially the same as the written one.

The defendant claimed that all of the confessions made to Warden Todhunter and to Sheriff Campbell and to Mr. McCullom were extorted from him through and by means of whipping, administered to him by Warden Todhunter while defendant was confined in the penitentiary, and that the confessions were not true, and that he did not drown or assist in the drowning of either Julius or the negro, Elbert Thomas; that he knew nothing about it; didn't know that Julius had been drowned until after his body was discovered and brought to the store of Mr. McCullom. Bell described the manner in which he was whipped and the instrument of torture applied to him, and insisted in his testimony that he denied and continued to deny for a while any knowledge of the alleged murder, but that, little by little, in answer to repeated questions and statements made to him that he did murder Julius and drown him, in order to escape the torture he confessed to the commission of the crime. He told how he was made to lie upon the floor, clad only in a thin shirt and trousers, and was whipped with a leathern strap attached to a handle—the strap was three and a-half feet long and three inches wide. This testimony is virtually uncontradicted. The warden who administered the whippings stoutly averred that the confessions were freely and voluntarily made, and, while admitting the whippings, stated on his direct examination that Bell was beaten to make him tell where the money —some fifteen or twenty dollars which Bell had confessed to having taken from the body of Julius—was hidden or disposed of, and that he whipped him also for insubordination; that "he was a mean, hard-headed nig-

84

ger.'' But, after a time, the warden stated that the whippings were begun in a day or two—or some three days—after Bell was brought to the penitentiary, and, while the warden said that Bell was not beaten very severely, he stated that he ''whipped until he conquered.'' He stated that he began to question Bell soon after his admission into the penitentiary as to his connection with the drowning of Julius and Thomas, and that this was at the request of the sheriff, Mr. Campbell; that the whippings were given upon Bell's failure to talk and to answer questions regarding the drowning, and that ''he finally told me little by little—until he finally told me all.'' While at one time the warden stated that he whipped Bell not to make him confess about the drowning, but only because he was insubordinate and to make him tell where he had put the money, he was asked this question:

''Q. Did you whip him at any time because he wouldn't confess and give details? A. I whipped him to try to make him tell where the money was. Q. Not about the killing of Julius McCullom? A. Well, I don't know—probably I might have done that. I don't know; maybe it was in connection with the case. Q. Did he make a free and voluntary confession or not? A. Well, I don't know that I could say Bell ever made a free and voluntary confession. I got a confession out of him by piecemeal—it was never very free. There never was any voluntary confession coming from this big nigger.''

The following questions were asked him by the court and answers made in response thereto:

''Q. Did you get this statement by persistent questioning from time to time? A. Yes sir. Q. The whippings you gave him were based upon his failure to talk to you and answer questions when you propounded to him questions relating to this matter as well as to his conduct? A. Yes sir. Q. After defendant told you what he did about this confession, whom did you advise that the confessions were made? A. The sheriff, Mr. Campbell.''

The sheriff, J. M. Campbell, testified also as to a confession made to him. He stated that Bell was transferred to the penitentiary by his (the sheriff's) son, and afterward he went over to the penitentiary and talked to Bell about it; that he made two trips to the penitentiary; that the first trip when he talked with Bell he was not able to get anything from him, but on the second trip Bell confessed, saying, "I am going to tell you the truth about this," and then proceeded to detail his confession, and Swain also made a confession at that time; that this confession was obtained within the walls of the penitentiary, and the only persons present were himself and Mr. McCullom.

The sheriff was asked the following questions:

"Q. At what time did you get this statement? A. What do you mean—what day? Q. How long after Bell had been taken to the penitentiary? A. I guess somewhere about ten days or two weeks. Q. You don't know when Todhunter whipped him—before or after you got the confession? A. No sir, I don't know."

It is contended that, although a confession might have been extorted from Bell by whipping him, a subsequent confession was made to Sheriff Campbell in the presence of Mr. McCullom, and that these confessions were admissible because made later in point of time, and that there were no threats made to him at the time of the confession or whippings administered to him, and that the confession was free and voluntary. The trial court adopted this view, and the testimony was admitted, although, as we have stated, the written confession, made subsequent to that made to Mr. Campbell, was excluded.

It is clear that the confessions made to Todhunter were the result of coercion, and that the whippings were anterior to any confession, for the warden admits that these whippings were begun within a few days—perhaps the first day, and not later than the fourth day of Bell's

incarceration—while the confession to Campbell, according to his testimony, could not have been obtained earlier than ten days or two weeks afterward. The environment of Bell had not been altered; he was still within the penitentiary, surrounded by the white man's walls, guarded by the white man's guns, and in terror of the white man's lash, when the confessions to Campbell were made.

In the case of *Love* v. *State,* 22 Ark. 336, which is the leading case in this State on the admissibility of confessions, the rule is laid down that confessions are not admissible against the party charged with crime, unless freely and voluntarily made, and the onus is upon the State to prove them of this character; and, when the original confession has been made under illegal influence, such influence will be presumed to continue and color all subsequent confessions, unless the contrary is clearly shown. That was the case where a murder had been committed, and a crowd of more than a hundred persons had gathered where the dead body was found, with the avowed purpose of ascertaining the murderer. A committee of twenty was formed to give shape and concert to the efforts to be made for the discovery of the perpetrator of the crime; by these a special committee of three was detailed to prosecute the inquiry. Suspicion was fixed upon the defendant, Love; he was sent for, brought to the place of assemblage, and put in charge of the committe of three. He was taken away from the crowd, was told that the committee was satisfied that he had killed deceased, and that it would be better for him to confess; that his brother had confessed, and a written statement of his was read to him. He was told that the committee would do all they could to save him, although they did not know that they could do so; that he was not the person they were after, but that such person was one Ackridge, who, they believed, had instigated the defendant to commit the murder. Up to this time the defendant denied the charge, when he was confronted with his brother, who had made the written statement

mentioned, and who said to the defendant concerning it, "Jarrett, you know it is true." Then the defendant confessed the murder, after having for a half or three quarters of an hour protested his innocence, and after he had been assured of protection by the committee. Defendant appeared to be afraid of Ackridge, from whom the committee promised he should be protected, as also from everybody else who might be incensed at him or should desire to injure him on account of his confessions.

These confessions were made the day before the defendant was taken to Fayetteville, where he was confined for a month in default of bail. During the month the defendant was confined at Fayetteville, he made frequent confessions like the one he made to the committee, always admitting that he shot the deceased, that he did it at the instance of Ackridge. These confessions are spoken of by the persons to whom he made them as being made freely, without any promise or threat from them, but without caution by them to the defendant against the consequences of the confessions. The court said:

"These latter confessions made at Fayetteville, if the only confessions that had been made by the defendant, would have been evidence against him, although the defendant was not warned that his confessions would be used against him. The confessions made to the committee were inadmissible. The confessions made at Fayetteville were incompetent evidence on account of the incompetency of the first confessions, unless it had been clearly shown by other evidence that the influences which induced the first confessions had ceased to operate upon the mind of the defendant. In this case there were no circumstances, such as length of time, an interval for reflection, a criminal accusation, information or warning not to depend upon the promises of protection the defendant had received, or anything else tending to break the uniformity of the confessions he had made to the committee; but the natural effect of his condition, and of all the attendant facts disclosed in the transcript, was

to induce him to a continuance of the confession, his fears of a summary punishment from an exasperated community, and of private injury from Ackridge, and his hopes of protection from all these impending evils, had extorted from him. Hence in this case the subsequent confessions, after proof of the original confession and its circumstances, should have been excluded from the jury.

"It is in precisely such cases, where the atrocity of the crime makes the criminal abhorrent, that the safeguards of the law must be well protected, that the just punishment of the guilty may not be a precedent or excuse for the illegal conviction of the innocent. Doubtless an adherence to such rules of law as the court below failed to observe, and as we are called upon to enforce, may sometimes screen the undeserving from merited punishment; but there is no safety for the greater portion of society, that is, the observers of the law, without preserving with strictness the integrity of legal rules that protect against perjury and wickedness, as well as against the weakness of those who are wrongfully suspected or accused of criminal acts."

This case has been approved and uniformly followed by a long line of decisions, and we hold the principles therein announced to be the settled rule of evidence in this State. *Smith* v. *State,* 74 Ark. 397, 85 S. W. 1123; *Turner* v. *State,* 109 Ark. 332, 158 S. W. 1072; *Pearrow* v. *State,* 146 Ark. 201, 225 S. W. 308; *Greenwood* v. *State,* 107 Ark. 568, 156 S. W. 427; *Dewein* v. *State,* 114 Ark. 472, 170 S. W. 582.

We think the facts in the case at bar stronger than those in the case of *Love* v. *State, supra.* Here we have a negro boy, whom the testimony of Mrs. McCullom, the mother of the unfortunate little Julius, characterizes as "a good Christian boy, if ever there was one." Her testimony showed that he had been the humble friend and companion of her children for six years; that he was obedient, kind and helpful; that he shared his horse, the pride of his heart, with Julius, whom he loved like a

brother; that he would carry the little children around on his horse, and in every way manifested a gentle and affectionate spirit. This is the "mean, hard-headed nigger" of whom Mr. Todhunter spoke. This negro boy was taken, on the day after the discovery of the homicide, while he was at his usual work, and placed in jail. He had heard them whipping Swain in the jail; he was taken from the jail to the penitentiary at Little Rock, and turned over to the warden, Captain Todhunter, who was requested by the sheriff to question him. This Todhunter proceeded to do, day after day, an hour at a time. There Bell was, an ignorant country negro boy, surrounded by all of those things that strike terror to the negro heart; he was told that he had drowned Julius McCullom, and that he must admit it, and asked if he hadn't done so; when he denied it, he was whipped by the warden, who "usually conquered when he began," according to the warden's own testimony. Under these conditions Bell finally made his confession. Then the sheriff came, and again he told of how he had drowned Julius and taken $20 from his person, and where he had hidden the money. When search was made, no money was found; he was visited again, and again whipped; he told of another place where the money was hidden, and, when it was not found at that place, he was whipped again, until he told of another place, saying that he had been lying, and not to whip him any more, and he would tell them where the money was; he told them another place, and yet the money was not found.

As in the case of *Love* v. *State, supra,* there was no change in the circumstances or anything else tending to break the uniformity of the conditions under which he had made the confessions to Todhunter, but the natural effect of his condition and all the attendant facts disclosed was to induce him to a continuation of his confessions; he was still in the penitentiary, and might justly fear further punishment from the man who "whipped until he conquered;" his hope to escape from the sting-

ing blows of the leathern strap, and the terror of the dread presence of one before whom he must have quaked as in the face of death itself must have powerfully influenced him and impelled him to repeat the confession already made.

It was the duty of the State to affirmatively show that the confessions made to the sheriff and McCullom were given free from the undue influence under which the prior confessions were made, and this it has wholly failed to do. The only reasonable inference, from all the facts, is that such influence did remain and produce the confession to Sheriff Campbell and Mr. McCullom, and is on a parity with the written confession later made, and should also have been excluded by the court.

For this error the case is reversed, and the cause remanded.