## CHAMBERS ET AL. *v.* FLORIDA.

No. 195.  Argued January 4, 1940.—Decided February 12, 1940.

*Messrs. Leon A. Ransom* and *S. D. McGill,* with whom *Mr. Thurgood Marshall* was on the brief, for petitioners.

*Mr. Tyrus A. Norwood,* Assistant Attorney General of Florida, with whom *Mr. George Couper Gibbs,* Attorney General, was on the brief, for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

The grave question presented by the petition for certiorari, granted in forma pauperis,[1] is whether proceedings in which confessions were utilized, and which culminated in sentences of death upon four young negro men in the State of Florida, failed to afford the safeguard of that due process of law guaranteed by the Fourteenth Amendment.[2]

---

[1] 308 U. S. 541.

[2] Petitioners Williamson, Woodward and Davis pleaded guilty of murder and petitioner Chambers was found guilty by a jury; all

*First.* The State of Florida challenges our jurisdiction to look behind the judgments below claiming that the issues of fact upon which petitioners base their claim that due process was denied them have been finally determined because passed upon by a jury. However, use by a State of an improperly obtained confession may constitute a denial of due process of law as guaranteed in the Fourteenth Amendment.[3] Since petitioners have seasonably asserted the right under the federal Constitution to have their guilt or innocence of a capital crime determined without reliance upon confessions obtained by means

---

were sentenced to death, and the Supreme Court of Florida affirmed. 111 Fla. 707, 151 So. 499; 152 So. 437. Upon the allegation that, unknown to the trial judge, the confessions on which the judgments and sentences of death were based were not voluntary and had been obtained by coercion and duress, the State Supreme Court granted leave to present a petition for writ of error coram nobis to the Broward County Circuit Court, 111 Fla. 707; 152 So. 437. The Circuit Court denied the petition without trial of the issues raised by it and the State Supreme Court reversed and ordered the issues submitted to a jury. 117 Fla. 642; 158 So. 153. Upon a verdict adverse to petitioners, the Circuit Court re-affirmed the original judgments and sentences. Again, the State Supreme Court reversed, holding that the issue of force, fear of personal violence and duress had been properly submitted to the jury, but the issue raised by the assignment of error alleging that the confessions and pleas "were not in fact freely and voluntarily made" had not been clearly submitted to the jury. 123 Fla. 734, 737; 167 So. 697, 700. A change of venue, to Palm Beach County, was granted, a jury again found against petitioners and the Broward Circuit Court once more reaffirmed the judgments and sentences of death. The Supreme Court of Florida, one judge dissenting, affirmed, 136 Fla. 568; 187 So. 156. While the petition thus seeks review of the judgments and sentences of death rendered in the Broward Circuit Court and reaffirmed in the Palm Beach Circuit Court, the evidence before us consists solely of the transcript of proceedings (on writ of error coram nobis) in Palm Beach County Court wherein the circumstances surrounding the obtaining of petitioners' alleged confessions were passed on by a jury.

[3] *Brown* v. *Mississippi,* 297 U. S. 278.

proscribed by the due process clause of the Fourteenth Amendment, we must determine independently whether petitioners' confessions were so obtained, by review of the facts upon which that issue necessarily turns.[4]

*Second.* The record shows—

About nine o'clock on the night of Saturday, May 13, 1933, Robert Darsey, an elderly white man, was robbed and murdered in Pompano, Florida, a small town in Broward County about twelve miles from Fort Lauderdale, the County seat. The opinion of the Supreme Court of Florida affirming petitioners' conviction for this crime stated that "It was one of those crimes that induced an enraged community . . ."[5] And, as the dissenting judge pointed out, "The murder and robbery of the elderly Mr. Darsey . . . was a most dastardly and atrocious crime. It naturally aroused great and well justified public indignation."[6]

Between 9:30 and 10 o'clock after the murder, petitioner Charlie Davis was arrested, and within the next twenty-four hours from twenty-five to forty negroes living in the community, including petitioners Williamson, Chambers, and Woodward, were arrested without warrants and confined in the Broward County jail, at Fort Lauderdale. On the night of the crime, attempts to trail the murderers by bloodhounds brought J. T. Williams, a convict guard, into the proceedings. From then until confessions were obtained and petitioners were sentenced, he took a prominent part. About 11 P. M. on the following Monday, May 15, the sheriff and Williams took several of the imprisoned negroes, including Williamson and Chambers, to the Dade County jail at Miami. The

[4] *Pierre* v. *Louisiana*, 306 U. S. 354, 358; *Norris* v. *Alabama*, 294 U. S. 587, 590.

[5] 136 Fla. 568, 572; 187 So. 156, 157.

[6] *Id.*, 574.

sheriff testified that they were taken there because he felt a possibility of mob violence and "wanted to give protection to every prisoner . . . in jail." Evidence of petitioners was that on the way to Miami a motorcycle patrolman drew up to the car in which the men were riding and the sheriff "told the cop that he had some negroes that he—[was] taking down to Miami to escape a mob." This statement was not denied by the sheriff in his testimony and Williams did not testify at all; Williams apparently has now disappeared. Upon order of Williams, petitioner Williamson was kept in the death cell of the Dade County jail. The prisoners thus spirited to Miami were returned to the Fort Lauderdale jail the next day, Tuesday.

It is clear from the evidence of both the State and petitioners that from Sunday, May 14, to Saturday, May 20, the thirty to forty negro suspects were subjected to questioning and cross questioning (with the exception that several of the suspects were in Dade County jail over one night). From the afternoon of Saturday, May 20, until sunrise of the 21st, petitioners and possibly one or two others underwent persistent and repeated questioning. The Supreme Court of Florida said the questioning "was in progress several days and all night before the confessions were secured" and referred to the last night as an "all night vigil." The sheriff who supervised the procedure of continued interrogation testified that he questioned the prisoners "in the day time all the week," but did not question them during any night before the all night vigil of Saturday, May 20, because after having "questioned them all day . . . [he] was tired." Other evidence of the State was "that the officers of Broward County were in that jail almost continually during the whole week questioning these boys, and other boys, in connection with this" case.

The process of repeated questioning took place in the jailer's quarters on the fourth floor of the jail. During the week following their arrest and until their confessions were finally acceptable to the State's Attorney in the early dawn of Sunday, May 21st, petitioners and their fellow prisoners were led one at a time from their cells to the questioning room, quizzed, and returned to their cells to await another turn. So far as appears, the prisoners at no time during the week were permitted to see or confer with counsel or a single friend or relative. When carried singly from his cell and subjected to questioning, each found himself, a single prisoner, surrounded in a fourth floor jail room by four to ten men, the county sheriff, his deputies, a convict guard, and other white officers and citizens of the community.

The testimony is in conflict as to whether all four petitioners were continually threatened and physically mistreated until they finally, in hopeless desperation and fear of their lives, agreed to confess on Sunday morning just after daylight. Be that as it may, it is certain that by Saturday, May 20th, five days of continued questioning had elicited no confession. Admittedly, a concentration of effort—directed against a small number of prisoners including petitioners—on the part of the questioners, principally the sheriff and Williams, the convict guard, began about 3:30 that Saturday afternoon. From that hour on, with only short intervals for food and rest for the questioners—"They all stayed up all night." "They bring one of them at a time backwards and forwards . . . until they confessed." And Williams was present and participating that night, during the whole of which the jail cook served coffee and sandwiches to the men who "grilled" the prisoners.

Sometime in the early hours of Sunday, the 21st, probably about 2:30 A. M., Woodward apparently "broke"—

as one of the state's witnesses put it—after a fifteen or twenty minute period of questioning by Williams, the sheriff and the constable "one right after the other." The State's Attorney was awakened at his home, and called to the jail. He came, but was dissatisfied with the confession of Woodward which he took down in writing at that time, and said something like "tear this paper up, that isn't what I want, when you get something worth while call me." [7] This same State's Attorney conducted the state's case in the circuit court below and also made himself a witness, but did not testify as to why Woodward's

---

[7] A constable of the community, testifying about this particular incident, said in part:

"Q. Were you there when Mr. Maire [State's Attorney] talked to Walter Woodward the first time he came over there?

"A. Yes, sir.

"Q. Take his confession down in writing?

"A. Yes.

" . . .

"Q. If he made a confession why did you all keep on questioning him about it. As a matter of fact, what he said that time wasn't what you wanted him to say, was it?

"A. It wasn't what he said the last time.

"Q. It wasn't what you wanted him to say, was it?

"A. We didn't think it was all correct.

" . . .

" Q. What part of it did you think wasn't correct. Would you say what he told you there at that time was freely and voluntarily made?

"A. Yes, sir.

" . . .

"Q. What he freely and voluntarily told you in the way of a confession at that time, it wasn't what you wanted?

"A. It didn't make up like it should.

"Q. What matter didn't make up?

"A. There was some things he told us that couldn't possible be true.

" . . .

"Q. What did Mr. Maire say about it at that time; did you hear Mr. Maire say at this time 'tear this paper up, that isn't what I want,

first alleged confession was unsatisfactory to him. The sheriff did, however:

"A. No, it wasn't false, part of it was true and part of it wasn't; Mr. Maire [the State's Attorney] said there wasn't enough. It wasn't clear enough.

" . . .

"Q. . . . Was that voluntarily made at that time?

"A. Yes, sir.

"Q. It was voluntarily made that time?

"A. Yes, sir.

---

when you get something worth while call me,' or words to that effect?

"A. Something similar to that.

"Q. That did happen that night?

"A. Yes, sir.

"Q. That was in the presence of Walter Woodward?

"A. Yes, sir."

And petitioner Woodward testified on this subject as follows:

"A. . . . I was taken out several times on the night of the 20th . . . So I still denied it. . . .

" . . . .

"A. He said I had told lies and kept him sitting up all the week and he was tired and if I didn't come across I would never see the sun rise.

" . . .

"A. . . . then I was taken back to the private cell. . . . and shortly after that they come back, shortly after that, twenty or twenty-five minutes, and bring me out. . . . I [told Williams] if he would send for the State Attorney he could take down what I said, I said send for him and I will tell him what I know. So he sent for Mr. Maire some time during Saturday night, must have been around one or two o'clock in the night, it was after midnight, and so he sent for Mr. Maire, I didn't know Mr. Maire then, but I know him now by his face.

" . . .

"A. Well he come in and said 'this boy got something to tell me' and Captain Williams says 'yes, he is ready to tell you.' . . . .

" . . .

" . . . Mr. Maire had a pen and a book to take down what I told him, which he said had to be on the typewriter, but I didn't see any typewriter, I saw him with a pen and book, so whether it was short-

"Q. You didn't consider it sufficient?

"A. Mr. Maire.

"Q. Mr. Maire told you that it wasn't sufficient, so you kept on questioning him until the time you got him to make a free and voluntary confession of other matters that he hadn't included in the first?

"A. No, sir, we questioned him there and we caught him in lies.

"Q. Caught all of them telling lies?

"A. Caught every one of them lying to us that night, yes, sir.

"Q. Did you tell them they were lying?

"A. Yes, sir.

"Q. Just how would you tell them that?

"A. Just like I am talking to you.

---

hand or regular writing I don't know, but he took it down with pen. After I told him my story he said it was no good, and he tore it up. . . .

". . .

"Q. What was it Mr. Maire said?

"A. He told them it wasn't no good, when they got something out of me he would be back. It was late he had to go back and go to bed.

". . .

"A. . . . I wasn't in the cell long before they come back. . . .

". . .

"Q. How long was that from the time you was brought into that room until Mr. Maire left there?

"A. Something like two or three hours, I guess, because it was around sunrise when I went into the room.

"Q. Had you slept any that night, Walter?

"A. No, sir. I was walked all night, not continually, but I didn't have no time to sleep except in short spaces of the night.

". . .

"Q. When Mr. Maire got there it was after daylight?

"A. Yes, sir.

". . .

"Q. Why did you say to them that morning anything after you were brought into the room?

"A. Because I was scared, . . .

"Q. You said 'Jack, you told me a lie'?

"A. Yes, sir."

After one week's constant denial of all guilt, petitioners "broke."

Just before sunrise, the state officials got something "worthwhile" from petitioners which the State's Attorney would "want"; again he was called; he came; in the presence of those who had carried on and witnessed the allnight questioning, he caused his questions and petitioners' answers to be stenographically reported. These are the confessions utilized by the State to obtain the judgments upon which petitioners were sentenced to death. No formal charges had been brought before the confessions. Two days thereafter, petitioners were indicted, were arraigned and Williamson and Woodward pleaded guilty; Chambers and Davis pleaded not guilty. Later the sheriff, accompanied by Williams, informed an attorney who presumably had been appointed to defend Davis that Davis wanted his plea of not guilty withdrawn. This was done, and Davis then pleaded guilty. When Chambers was tried, his conviction rested upon his confession and testimony of the other three confessors. The convict guard and the sheriff "were in the Court room sitting down in a seat." And from arrest until sentenced to death, petitioners were never—either in jail or in court—wholly removed from the constant observation, influence, custody and control of those whose persistent pressure brought about the sunrise confessions.

*Third.* The scope and operation of the Fourteenth Amendment have been fruitful sources of controversy in our constitutional history.[8] However, in view of its his-

---

[8] "There have been long-continued and constantly recurring differences of opinion as to whether general legislative acts regulating the use of property could be invalidated as violating the due process clause of the Fourteenth Amendment. *Munn* v. *Illinois*, 94 U. S. 113, 125, dissent 136–154; *Chicago M. & St. P. R. Co.* v. *Minnesota*,

236

torical setting and the wrongs which called it into being, the due process provision of the Fourteenth Amendment—just as that in the Fifth—has led few to doubt that it was intended to guarantee procedural standards adequate and appropriate, then and thereafter,[9] to protect, at all times, people charged with or suspected of crime by those holding positions of power and authority. Tyrannical governments had immemorially utilized dictatorial criminal procedure and punishment to make scapegoats of the weak, or of helpless political, religious, or racial minorities and those who differed, who would not conform and who resisted tyranny. The instruments of such governments were, in the main, two. Conduct, innocent when engaged in, was subsequently made by fiat criminally punishable without legislation. And a liberty loving people won the principle that criminal punishments could not be inflicted save for that which proper legislative action had already by "the law of the land" forbidden when done. But even more was needed. From the popular hatred and abhorrence of illegal confinement, torture and extortion of confessions of violations of the "law of the land" evolved the fundamental idea that no man's life, liberty or property be forfeited as criminal punishment for violation of that law until there had been a charge fairly made and fairly tried in a pub-

134 U. S. 418, dissent 461–466. And there has been a current of opinion—which this court has declined to adopt in many previous cases—that the Fourteenth Amendment was intended to make secure against state invasion all the rights, privileges and immunities protected from federal violation by the Bill of Rights (Amendments I to VIII). See, e. g., *Twining* v. *New Jersey*, 211 U. S. 78, 98–9, Mr. Justice Harlan, dissenting, 114; *Maxwell* v. *Dow*, 176 U. S. 581, dissent 606; *O'Neil* v. *Vermont*, 144 U. S. 323, dissent 361; *Palko* v. *Connecticut*, 302 U. S. 319, 325, 326; *Hague* v. *C. I. O.*, 307 U. S. 496.

[9] Cf. *Weems* v. *United States*, 217 U. S. 349, 372, 373, and dissent setting out (p. 396) argument of Patrick Henry, 3 Elliot, Debates, 447.

lic tribunal free of prejudice, passion, excitement, and tyrannical power. Thus, as assurance against ancient evils, our country, in order to preserve "the blessings of liberty," wrote into its basic law the requirement, among others, that the forfeiture of the lives, liberties or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed.[10]

The determination to preserve an accused's right to procedural due process sprang in large part from knowledge of the historical truth that the rights and liberties of people accused of crime could not be safely entrusted to secret inquisitorial processes. The testimony of centuries, in governments of varying kinds over populations of different races and beliefs, stood as proof that physical and mental torture and coercion had brought about the tragically unjust sacrifices of some who were the noblest and most useful of their generations. The rack, the thumbscrew, the wheel, solitary confinement, protracted questioning and cross questioning, and other ingenious forms of entrapment of the helpless or unpopular had left their wake of mutilated bodies and shattered minds along the way to the cross, the guillotine, the stake and

---

[10] As adopted, the Constitution provided, "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." (Art. I, § 9.) "No Bill of Attainder or ex post facto Law shall be passed" (*Id.*), "No State shall . . . pass any Bill of Attainder, or ex post facto Law. . . ." (*Id.*, § 10), and "No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court" (Art. III, § 3). The Bill of Rights (Amend. I to VIII). Cf. Magna Carta, 1297 (25 Edw. 1); The Petition of Right, 1627 (3 Car. 1, c. 1.); The Habeas Corpus Act, 1640 (16 Car. 1, c. 10.), An Act for [the Regulating] the Privie Councell and for taking away the Court commonly called the Star Chamber; Stat. (1661) 13 Car. 2, Stat. 1, C. 1 (Treason); The Bill of Rights (1688) (1 Will. & Mar. sess. 2, c. 2.); all collected in "Halsbury's Stat. of Eng." (1929) Vol. 3.

238

the hangman's noose. And they who have suffered most from secret and dictatorial proceedings have almost always been the poor, the ignorant, the numerically weak, the friendless, and the powerless.[11]

This requirement—of conforming to fundamental standards of procedure in criminal trials—was made operative against the States by the Fourteenth Amendment. Where one of several accused had limped into the trial court as a result of admitted physical mistreatment inflicted to obtain confessions upon which a jury had returned a verdict of guilty of murder, this Court recently declared, *Brown* v. *Mississippi*, that "It would be difficult to conceive of methods more revolting to the sense of justice than those taken to procure the confessions of these petitioners, and the use of the confessions thus obtained as the basis for conviction and sentence was a clear denial of due process." [12]

Here, the record develops a sharp conflict upon the issue of physical violence and mistreatment, but shows, without conflict, the dragnet methods of arrest on suspicion without warrant, and the protracted questioning and cross questioning of these ignorant young colored tenant farmers by state officers and other white citizens, in a fourth floor jail room, where as prisoners they were without friends, advisers or counselors, and under circumstances calculated to break the strongest nerves and

[11] "In all third degree cases, it is remarkable to note that the confessions were taken from 'men of humble station in life and of a comparatively low degree of intelligence, and most of them apparently too poor to employ counsel and too friendless to have any one advise them of their rights.'" Filamor, "Third Degree Confession," 13 Bombay L. J., 339, 346. "That the third degree is especially used against the poor and uninfluential is asserted by several writers, and confirmed by official informants and judicial decisions." IV National Commission On Law Observance and Enforcement, Reports, (1931) Ch. 3, p. 159. Cf. *Morrison* v. *California,* 291 U. S. 82, 95.

[12] 297 U. S. 278, 286.

the stoutest resistance. Just as our decision in *Brown* v. *Mississippi* was based upon the fact that the confessions were the result of compulsion, so in the present case, the admitted practices were such as to justify the statement that "The undisputed facts showed that compulsion was applied."[13]

For five days petitioners were subjected to interrogations culminating in Saturday's (May 20th) all night examination. Over a period of five days they steadily refused to confess and disclaimed any guilt. The very circumstances surrounding their confinement and their questioning without any formal charges having been brought, were such as to fill petitioners with terror and frightful misgivings.[14] Some were practical strangers in

---

[13] See *Ziang Sung Wan* v. *United States*, 266 U. S. 1, 16. The dissenting Judge below noted, 136 Fla. 568, 576; 187 So. 156, 159, that, in a prior appeal of this same case, the Supreme Court of Florida had said: "Even if the jury totally disbelieved the testimony of the petitioners, the testimony of Sheriff Walter Clark, and one or two of the other witnesses introduced by the State, was sufficient to show that these confessions were only made after such constantly repeated and persistent questioning and cross-questioning on the part of the officers and one J. T. Williams, a convict guard, at frequent intervals while they were in jail, over a period of about a week, and culminating in an all-night questioning of the petitioners separately in succession, throughout practically all of Saturday night, until confessions had been obtained from all of them, when they were all brought into a room in the jailer's quarters at 6:30 on Sunday morning and made their confessions before the state attorney, the officers, said J. T. Williams, and several disinterested outsiders, the confessions, in the form of questions and answers, being taken down by the court reporter, and then typewritten.

"Under the principles laid down in Nickels v. State, 90 Fla. 659, 106 So. 479; Davis v. State, 90 Fla. 317, 105 So. 843; Deiterle v. State 98 Fla. 739, 124 So. 47; Mathieu v. State, 101 Fla. 94, 133 So. 550, these confessions were not legally obtained." 123 Fla. 734, 741; 167 So. 697, 700.

[14] Cf. the statement of the Supreme Court of Arkansas, *Bell* v. *State*, 180 Ark. 79, 89; 20 S. W. 2d 618, 622: "This negro boy was

the community; three were arrested in a one-room farm tenant house which was their home; the haunting fear of mob violence was around them in an atmosphere charged with excitement and public indignation. From virtually the moment of their arrest until their eventual confessions, they never knew just when any one would be called back to the fourth floor room, and there, surrounded by his accusers and others, interrogated by men who held their very lives—so far as these ignorant petitioners could know—in the balance. The rejection of petitioner Woodward's first "confession," given in the early hours of Sunday morning, because it was found wanting, demonstrates the relentless tenacity which "broke" petitioners' will and rendered them helpless to resist their accusers further. To permit human lives to be forfeited upon confessions thus obtained would make of the constitutional requirement of due process of law a meaningless symbol.

We are not impressed by the argument that law enforcement methods such as those under review are necessary to uphold our laws.[15] The Constitution proscribes

taken, on the day after the discovery of the homicide while he was at his usual work, and placed in jail. He had heard them whipping Swain in the jail; he was taken from the jail to the penitentiary at Little Rock and turned over to the warden, Captain Todhunter, who was requested by the sheriff to question him. This Todhunter proceeded to do, day after day, an hour at a time. There Bell was, an ignorant country boy surrounded by all of those things that strike terror to the negro heart; . . ." See Münsterberg, On the Witness Stand, (1927) 137 et seq.

[15] The police practices here examined are to some degree widespread throughout our country. See Report of Comm. on Lawless Enforcement of the Law (Amer. Bar Ass'n) 1 Amer. Journ. of Pol. Sci., 575; Note 43 H. L. R. 617; IV National Commission On Law Observance And Enforcement, supra, Ch. 2, § 4. Yet our national record for crime detection and criminal law enforcement compares poorly with that of Great Britain where secret interrogation of an

such lawless means irrespective of the end. And this argument flouts the basic principle that all people must stand on an equality before the bar of justice in every American court. Today, as in ages past, we are not without tragic proof that the exalted power of some governments to punish manufactured crime dictatorially is the handmaid of tyranny. Under our constitutional system, courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are non-conforming victims of prejudice and public excitement. Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death. No higher duty, no more solemn responsibility, rests upon this Court, than that of translating into living law and maintaining this constitutional shield deliberately planned and inscribed for the benefit of every human being subject to our Constitution—of whatever race, creed or persuasion.

---

accused or suspect is not tolerated. See, Report of Comm. on Lawless Enforcement of the Law, *supra*, 588; 43 H. L. R., *supra*, 618. It has even been suggested that the use of the "third degree" has lowered the esteem in which administration of justice is held by the public and has engendered an attitude of hostility to and unwillingness to coöperate with the police on the part of many people. See, IV National Commission, etc., *supra*, p. 190. And, after scholarly investigation, the conclusion has been reached "that such methods, aside from their brutality, tend in the long run to defeat their own purpose; they encourage inefficiency on the part of the police." Glueck, Crime and Justice, (1936) 76. See IV National Commission, etc., *supra*, 5; cf. 4 Wigmore, Evidence, (2d ed.) § 2251. The requirement that an accused be brought promptly before a magistrate has been sought by some as a solution to the problem of fostering law enforcement without sacrificing the liberties and procedural rights of the individual. 2 Wig., *supra*, § 851, IV National Commission, etc., *supra*, 5.

The Supreme Court of Florida was in error and its judgment is

*Reversed.*

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.