UNITED STATES of America ex rel.
Robert R. HYDE, Petitioner-
Appellant,

v.

Daniel McMANN, Acting Warden, Clinton
Prison and People of State of New
York, Respondents-Appellees.

No. 132, Docket 25234.

United States Court of Appeals
Second Circuit.

Argued Dec. 11, 1958.

Decided Feb. 19, 1959.

Edward A. Woolley, New York City, for petitioner-appellant.

George K. Bernstein, Asst. Atty. Gen. of State of New York (Paxton Blair, Sol. Gen., Louis J. Lefkowitz, Atty. Gen., and Samuel A. Hirshowitz, Asst. Sol. Gen., New York City, on the brief), for respondents-appellees.

Before CLARK, Chief Judge, and HINCKS and LUMBARD, Circuit Judges.

LUMBARD, Circuit Judge.

This is an appeal *in forma pauperis* from a denial of a writ of habeas corpus by the district court without a hearing. The principal issue is whether the state so improperly interfered with the petitioner's preparation of his defense by confining him to prison without bail, and in default of his posting bail, that his conviction was obtained contrary to due process of law in violation of his rights under the Fourteenth Amendment. The claim principally rests upon allegations that his imprisonment for more than three months prior to trial and the refusal to delay the start of his trial for more than a day prevented him from locating a prostitute known to him only as "Jo Ann" with whom he claims to have spent the night in a room on West 23rd Street in New York City during the time when the crimes for which he was convicted were committed.

As it is clear from the undisputed facts that the petitioner's rights to prepare his defense were not so unduly curtailed as to amount to a denial of due process, we affirm Judge Foley's denial, without a hearing, of a writ of habeas corpus.

The undisputed facts [1] regarding the crimes for which Hyde was tried are these: At a few minutes past five A.M. on February 8, 1946, Philip Shaw was accosted on Union Street near Rochester Avenue in Brooklyn by a man who demanded money from him. When Shaw said that he had none, the assailant shot him in the right shoulder and again in the stomach and then fled. The scene of the shooting was only several blocks from where Hyde had lived two years before. Shaw was taken to Kings County Hospital where he remained in critical condition for some days. Later that afternoon a detective located Hyde at the Seamen's Y. M. C. A. in Manhattan and in his room found a box of cartridges and a fully loaded revolver, which Hyde admitted were his.

At the trial Hyde was identified by Shaw as his assailant.[2] The District Attorney established that Shaw had been shot with a bullet fired from Hyde's gun and that Hyde's automobile had been found by the police shortly after the shooting parked near the scene of the holdup with its motor still warm. At about 6:30 A.M. of February 8 Hyde reported to the Tenth Detective Squad office in Manhattan that his automobile, which he said had been parked on West 23rd Street the night before, was missing.

Hyde took the stand in his own defense and attempted to explain these incriminating circumstances. He testified that he had met a woman named Jo Ann in a bar and spent the night of February 7 in her room on 23rd Street between Ninth and Tenth Avenues in Manhattan and that he had remained there until it was "light" on the morning of February 8. Hyde further testified that he had carried the gun with him in New York because some of his effects had been stolen from his car the night before he arrived in the city. He admitted, on cross-examination, that he had had the gun in his topcoat pocket when he went to Jo Ann's room on the night of February 7 and that the gun was still in his pocket when he awoke the next morning. But he claimed that the gun had been taken out of his coat pocket

---

1. We have considered certain additional facts, mainly certified transcripts of arrangement proceedings and affidavits from petitioner and his trial counsel, which were not before the district court. The Attorney General has not objected to the consideration of these facts and none of them are controverted.

2. The validity of Shaw's identification of Hyde was one of the central issues of the trial largely because Shaw had first declined to identify Hyde on the afternoon of the shooting when the police brought Hyde to the hospital where Shaw was being treated. But Shaw testified at trial that fear for his wife's safety had prompted this initial refusal to identify Hyde and that ten or eleven hours later, after being assured by the police that no harm would come to his family, he had identified Hyde as the one who had shot him.

while he was asleep, had been used to commit the crime, which occurred at about five A.M. in Brooklyn, and had been returned to his topcoat pocket before he awoke at about six A.M.

Hyde also claimed at trial that he had parked his car near Jo Ann's room the night before the shooting but that when he awoke the next morning he could not find it. As above stated, Hyde called the police about 6:30 A.M. to report that his car was missing.

The jury was asked to believe that someone had taken Hyde's gun while he slept, had also taken his car, committed the crimes at five A.M., and had returned the gun before six A.M. to where Hyde was sleeping on 23rd Street, although abandoning the car in Brooklyn. It is small wonder that a jury convicted Hyde of robbery and three related crimes of assault for which he is now serving a term of 7½ to 15 years. The Appellate Division affirmed but reduced the sentence. People v. Hyde, 2 Dept.1957, 3 A.D.2d 854, 161 N.Y.S.2d 808. Leave to appeal to the New York Court of Appeals was denied and certiorari was denied by the Supreme Court of the United States, Hyde v. State of New York, 1958, 355 U.S. 916, 78 S.Ct 346, 2 L.Ed.2d 276.

On February 9, the day following his arrest, and on five subsequent occasions thereafter—February 17, March 13, March 19, March 26 and April 5—Hyde was brought before a magistrate for arraignment and held without bail.[3] Hyde spent from February 17 to March 13 in a city hospital under commitment by the court for examination as to his mental condition. Up until March 26 Hyde was represented by the Legal Aid Society, but on the March 26 arraignment and thereafter through the trial and sentence Hyde was represented by counsel retained by his family. On April 5 the District Attorney presented evidence of a prima facie case before the magistrate.

During the interval prior to Hyde's indictment on May 18, Hyde's counsel spent about two weeks looking for Jo Ann but without success. During this time Hyde also applied for bail but it was not until he was arraigned to plead to the indictment on May 18 that bail was fixed at $25,000. This bail he and his family were unable to raise. At no time did petitioner seek a writ of habeas corpus which is the only way in which his detention could have been reviewed under New York law. See New York Civil Practice Act, § 1230, and People ex rel. Shapiro v. Keeper of Prison, 1943, 290 N.Y. 393, 49 N.E.2d 498. Code of Criminal Procedure, §§ 517, 566.[4]

On May 28, 1956, after the jury had been impaneled, petitioner's counsel moved for a continuance in order to permit Hyde himself to search for the missing witness. The trial judge granted a continuance until the following morning, ordering two detectives to accompany Hyde. Hyde asserts that during that afternoon and evening he succeeded, where his counsel had failed, in locating the house where he claimed to have spent

---

3. Section 553 of the New York Code of Criminal Procedure provides that "as a matter of discretion" the court may grant bail to a person accused of committing a felony, other than a capital offense.

4. The Attorney General contends that we must dismiss the petition because Hyde failed to invoke the only appropriate remedy for the pre-trial denial of bail but no cases are cited for this proposition and there is no reason to believe that the New York courts would contenance such an illogical rule of preclusion. We are not concerned here with the question of whether Hyde was improperly deprived of his liberty before trial. By itself, on these facts, this was a question for the state. The question before us is the broader constitutional question of reasonable opportunity to prepare a defense and as bearing upon that, his detention, whether rightful or wrongful, is simply one of the facts to be considered. Obviously no one could know before the trial to what extent Hyde's detention together with other circumstances, would prejudice him. Therefore his failure to exhaust his remedies regarding his detention cannot preclude consideration of the facts regarding that detention as they may bear upon the constitutional question.

the night of February 7–8 and that he learned that a girl answering the description of Jo Ann had resided at the house but that she had left about 17 days after the date of his arrest when the bar in which she worked was raided by the police. According to Hyde this information was reported to the trial judge in chambers the following morning and his counsel made a plea for a further continuance but the trial judge denied this and ordered the trial to begin.

Hyde maintains that he then requested his counsel to move for a continuance in open court on the record, that when counsel refused on the ground that the trial judge might be antagonized, Hyde moved to discharge him. The trial judge denied the motion after ascertaining from an examination of counsel, but not of Hyde whom he refused to hear on the matter, that no question of the attorney's integrity was involved.

█ We can find no basis on these undisputed facts for the petitioner's claim that his state court conviction is tainted with such unfairness as to amount to a denial of due process. At all times from February 8, 1956 to May 29, 1956, when his trial commenced, Hyde was represented by counsel. Even deducting the period of 25 days when Hyde was under hospital observation, he and his counsel had 86 days in which to locate "Jo Ann" assuming she existed.

█ Whether or not a defendant charged with a felony is to be admitted to bail or, if bail is fixed, what amount is reasonable, are normally questions solely for the state to decide. Betts v. Brady, 1941, 316 U.S. 455, 461–462, 62 S.Ct. 1252, 86 L.Ed. 1595; Chambers v. State of Florida, 1940, 309 U.S. 227, 235–236, 60 S.Ct. 472, 84 L.Ed. 716, note 8; Collins v. Johnston, 1915, 237 U.S. 502, 510, 35 S.Ct. 649, 59 L.Ed. 1071; O'Neil v. State of Vermont, 1891, 144 U.S. 323, 332, 12 S.Ct. 693, 36 L.Ed. 450; McEl-

vaine v. Brush, 1891, 142 U.S. 155, 158, 12 S.Ct. 156, 35 L.Ed. 971; 51 Mich.L. Rev. 389, 390 (1953). It is only as the continued imprisonment of the defendant may, with other factors, make it impossible for him to locate a crucial witness, who in fact is shown to exist, that a federal court would be justified to the extent of making further inquiry of its own. Here the defendant had counsel available to prepare his defense and locate witnesses; and counsel had more than ample time to conduct the search. The record thus discloses that the state provided an ample opportunity for the search and this is all that is required of it.

Although his counsel had had many weeks in which to search for Jo Ann, the trial judge on May 28 permitted Hyde to make his own search in the custody of police and for that purpose adjourned the trial until the next day. This delay was an extra indulgence entirely within the discretion of the trial court. *A fortiori* we need not consider the court's denial of still another delay on May 29 in order to follow up leads which petitioner claimed he had developed on May 28. It would be absurd if a federal court were to reexamine rulings of this nature in such a setting as appears here.[5]

█ Likewise the petitioner's complaint about the trial judge's refusal to hear his motion to discharge his counsel was clearly a matter within the trial judge's discretion. The right to discharge counsel after the trial has begun is a qualified one and to support a reversal of a conviction because the trial judge denied a motion to discharge counsel there must be a showing that defendant was prejudiced by the denial. United States v. Private Brands, 2 Cir., 1957, 250 F.2d 554, 557, certiorari denied, 355 U.S. 957, 78 S.Ct. 542, 2 L.Ed. 2d 532; United States v. Paccione, 2 Cir., 1955, 224 F.2d 801, 802; United States v. Mitchell, 2 Cir., 1943, 138 F.2d 831, certiorari denied, 1944, 321 U.S.

5. Lisenba v. People of State of California, 1941, 314 U.S. 219, 228, 62 S.Ct. 280, 86 L.Ed. 166; Franklin v. State of South Carolina, 1910, 218 U.S. 161, 168, 30 S. Ct. 640, 54 L.Ed. 980.

**944**

794, 64 S.Ct. 785, 88 L.Ed. 1083; United States v. Mitchell, 2 Cir., 1943, 137 F.2d 1006, 1011. No such showing is made here by petitioner. His motion was appropriately characterized by the trial judge as "shenanigans" and apparently this stratagem of the petitioner was not repeated.

Nor need we examine the claim arising from the alleged illegal seizure of petitioner's revolver. Wolf v. People of State of Colorado, 1949, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782.

Taking all of petitioner's alleged errors together they do not give any color to the claim that his conviction was tainted by a denial of due process by the New York authorities.

Assigned counsel for the petitioner merits this special commendation of this court for his very thorough, painstaking and well considered prosecution of this appeal.

The order is affirmed.