**UNITED STATES of America ex rel. John MASCIA, Petitioner-Appellant,**

**v.**

**Hon. John ZELKER, Superintendent, Green Haven Correctional Facility, Stormville, New York, Respondent-Appellee.**

**No. 149, Docket 71-1578.**

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1971.

Decided Oct. 22, 1971.

Richard Marlin, New York City (Marshall, Bratter, Greene, Allison & Tucker and Joel M. Leifer, New York City, on the brief), for petitioner-appellant.

Ilene J. Slater, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen. and Samuel A. Hirshowitz, First Asst. Atty. Gen., on the brief), for respondent-appellee.

Before LUMBARD, MANSFIELD and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

On September 23, 1963, John Mascia and Anthony Piracci were brought to trial in the Supreme Court, Kings County, upon an indictment for first degree murder. Four and one half days of trial ensued during which sixteen government witnesses testified, two to the effect that Mascia had told them that he had shot to death one Joseph ("Joe Fish") Vitale in the early morning hours of May 25, 1963, and one, Detective Teknus, as to Piracci's inculpatory statements made to him. Mascia thereupon changed his plea of not guilty to a plea of guilty to murder in the second degree. His plea was accepted and he was sentenced to twenty years to life imprisonment. He appeals from the district court's denial, without a hearing, of his application for a writ of habeas corpus. We affirm.

Mascia asserts that, under the circumstances described below, his guilty plea was involuntarily given and that he is entitled to a new trial or at least to an evidentiary hearing to determine whether his plea was coerced. We do not agree.

One of the prosecution witnesses, Ann Wyler, testified that Mascia had told her prior to the murder that he was looking for Vitale, that he was "looking to hit him." She further testified that at 4:50 A.M. Saturday, May 25, 1963, Mascia had come to her apartment and told her that he and Piracci had just murdered Vitale in Owl's Head Park, Brooklyn. Maria Mastronardi, living at the time with Mrs. Wyler, also testified to the fact of the visit. Arlene Guerriero, who had been living with Vitale, testified that several months prior to the murder Mascia had told her that Vitale owed him money, and that when he found Vitale "he would cut off his hands so he won't shoot up any more," that "things would be worse. He won't be able to shoot up any more." Louise Vannatta, Mascia's girl friend for a year and a half prior to the murder, testified that on Thursday, May 23, 1963, Mascia had told her that he was looking for Vitale, and that on Saturday night, May 25, 1963, he showed her a newspaper account apparently telling of the murder, related the details of the murder to her, and admitted that he had done it "because Vitale was a rat and that he had a lot on him, and that he could put him away for fifteen years." She further testified that Mascia had told her both that Vitale was a "stool pigeon," and that Vitale went with Piracci and Mascia to Owl's Head Park thinking that Mascia was "going to give him a fix." She also testified that Mascia told her that he had gone to the apartment of Ann Wyler shortly after the murder.

Detective Teknus's testimony concerning Piracci's inculpatory statements was redacted to avoid prejudice to Mascia, the word "Blank" being substituted

whenever reference was made to Piracci's accomplice. The testimony included, however, Piracci's statements that "Blank's" 1963 white Pontiac convertible was used to transport the three men to the park, and to transport the remaining two away. Mascia claims that the redaction was nullified by the assistant district attorney's repeated efforts to connect Mascia to such an automobile, and that he was consequently denied his Sixth Amendment right to confrontation under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). He is entitled to a new trial, he asserts, because this constitutional violation had an "abiding impact," McMann v. Richardson, 397 U.S. 759, 767, 90 S. Ct. 1441, 25 L.Ed.2d 763 (1970), and tainted his guilty plea.

The Supreme Court in *Richardson* held that, without more, a showing that a guilty plea was triggered by a coerced confession does not entitle a petitioner, assisted by effective counsel at trial, to habeas corpus relief. A guilty plea under these circumstances amounts to a refusal by the defendant to present his federal claims to a state court in the first instance. The Court noted that it was not considering "the situation where the circumstances that coerced the confession have abiding impact and also taint the plea. *Cf.* Chambers v. Florida, 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716] (1940)." *Chambers* involved confessions given in the context of a mass roundup and five-day continuous interrogation of Negro tenant farmers in Florida. As the Court in *Richardson* noted,

> In *Chambers* the voluntariness of the confessions was properly considered by this Court both because the alleged coercion producing the confessions appeared to carry over to taint the guilty pleas and because the convictions were based on the confessions as well as the guilty pleas. 397 U.S. at 767 n. 12, 90 S.Ct. at 1447.

■ Mascia's guilty plea was not prompted by an allegedly coerced confession of his own, but by the allegedly improper admission of a co-defendant's confession. We agree, however, that the *Richardson* holding "lays down a rule for application to all constitutional claims." Bergin v. MacDougall, 432 F.2d 935, 936 (2d Cir. 1970) (per curiam). In *Bergin* this court held that a petitioner who pleaded guilty in a state court effectively waived his right to raise on collateral attack the issue of deprivation of speedy trial. Mascia contends that *Bergin* threatens to eviscerate the "abiding impact" exception of *Richardson*. But *Bergin* merely says that there is "a rule" to be followed absent the exceptional circumstances typified by *Chambers*.

Even should we assume that the testimony was improperly redacted to the detriment of Mascia's Sixth Amendment rights, and that the "abiding impact" exception of *Richardson* extends to guilty pleas tainted by the abiding impact of any asserted constitutional violation, and is not restricted to claims of involuntary pleas resulting from coerced confessions, we nevertheless find that the circumstances alleged by Mascia fall substantially short of those necessary to come within the exception. The district court correctly dismissed the application on the basis of *Richardson* and *Bergin*.

Mascia' next claim is that an evidentiary hearing is in order to determine whether his plea was voluntary in light of an alleged statement by the trial judge to his attorney that the jury was going to find him guilty and send him to the electric chair, and an alleged threat by Piracci to testify perjuriously against him if he refused to plead guilty. Piracci's own guilty plea would not have been accepted by the prosecutor, Mascia claims, unless Mascia would also plead guilty or Piracci would testify against him. Mascia contends that he steadfastly maintained his innocence until finally his will was overborne by the foregoing pressures as well as by insistent pressures from his family, including threats of suicide from his mother if he should die in the electric chair. We

think that these allegations, in the circumstances here presented, are insufficient to require an evidentiary hearing.

First, Mascia's trial attorney testified at a hearing on Mascia's motion to withdraw the guilty plea that he had expressed to Mascia his own opinion that the trial judge thought the case looked bad for Mascia. The attorney flatly denied that the judge had ever made any such statement to him. Mascia did not testify at that hearing, and has never adduced any evidence to substantiate his bald claim.

Second, the proposition that guilty pleas induced by threats are vulnerable is supported only by cases dealing with threats made by government officials. See, *e. g.*, Brady v. United States, 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); Waley v. Johnston, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942). Mascia could have confronted Piracci's promised "perjury" had Mascia not elected to plead guilty and end the trial.

Finally, as to the combined pressures of counsel and family, language from this court's decision in United States ex rel. Brown v. LaVallee, 424 F.2d 457, 460–461 (2d Cir. 1970), cert. denied 401 U.S. 942, 91 S.Ct. 946, 28 L.Ed.2d 223, reh. denied 402 U.S. 990, 91 S.Ct. 1675, 29 L.Ed.2d 156 (1971), is apposite:

> Brown's belief that he had a good defense to the charge was ranged against the well-considered advice of his lawyers and the pleading of his mother. All of his closest advisors believed that he would certainly be found guilty by a jury and that he might well be sentenced to death. The lawyers in good faith presented their experienced assessment of Brown's situation. Brown's mother forced him to consider the effects which a conviction of murder in the first degree, and perhaps execution, would have on the family.

> The realities of the defendant's situation and the shattering effect of an unsuccessful defense are the very ingredients of a rational choice for one in Brown's position. In the mouths of the prosecutor or the trial judge, these statements might have been coercive; coming from his lawyers and his mother, they were sound advice.

The evidence heard against Mascia during the four and one-half days of trial was very damaging. The claim regarding the trial judge's statement is wholly unsubstantiated, and indeed was refuted pointblank by Mascia's attorney. Threats of perjury coming from co-defendants, at least in the situation presented to us, do not amount to threats made by government officials which may render a guilty plea involuntary. As likely as not such "threats" are nothing more than advance notice regarding the strategy of a co-defendant made necessary by the vicissitudes of a trial. Mascia's attorney and his family, not the state or the trial court, pressured him to act according to what they considered to be his best interests. Mascia's claims are not persuasive that in the totality of circumstances his plea of guilty was anything other than the product of voluntary and rational choice.

Affirmed.